# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-19-00460-CV

---

**In the Matter of X. J.**

---

**FROM THE 98TH DISTRICT COURT OF TRAVIS COUNTY**
**NO. JV37242, THE HONORABLE RHONDA HURLEY, JUDGE PRESIDING**

---

### M E M O R A N D U M   O P I N I O N

X.J. appeals his delinquent-child adjudication and disposition after the juvenile court found he had engaged in delinquent conduct, specifically aggravated assault with a deadly weapon. *See* Tex. Pen. Code § 22.02. After the disposition hearing, the court ordered X.J. committed to the Texas Juvenile Justice Department (TJJD) for a determinate period of ten years. *See* Tex. Fam. Code §§ 51.03, 54.04. X.J. asserts that the juvenile court erred in sustaining the State's objections to the admission of two exhibits, one during the adjudication hearing and one during the disposition hearing. We will affirm the juvenile court's order of adjudication and disposition.

### BACKGROUND

The juvenile court heard evidence that, on October 20, 2018, X.J., a 15-year-old boy who was attending a house party, shot Demarcus Coley, an adult who came to the house party to check on his son, A.C. At trial, X.J.'s counsel argued as a defensive theory that Coley provoked the altercation and that X.J. acted in self defense, justifying his use of force.

K.L., a ninth grader, testified that on the evening of the incident she attended a birthday party for a friend named D. K.L. stated that the party was at a house in Pflugerville and that it was a "full house." K.L. testified that at some point during the party she and a group of people went outside and she saw X.J. and Coley in the street facing each other talking. K.L. testified that Coley was bigger than X.J. K.L. could not hear what they were saying and she did not see Coley make any movements with his arms or his body toward X.J. K.L. stated that she did not see anything that made her think Coley was angry. K.L. then saw X.J. back up and pull out a gun from his waist and pull the trigger. K.L. testified that she saw the gun fire two times after which Coley fell to the ground. K.L. then ran inside to call her parents.

K.H., a fifteen-year-old, testified that he and some friends including Coley's son, A.C., attended the birthday party. When K.H. arrived, people were inside dancing and having a good time. K.H. testified that at some point he saw two girls fighting and D.'s brother kicked everyone out of the house. K.H. and his friends decided they wanted to leave the party and called the mother of one of the friends. While they were waiting outside for their ride home, K.H. saw Coley and X.J. facing each other and talking in the street. K.H. testified that Coley appeared angry and that X.J. appeared surprised. K.H. stated that he heard X.J. yell "Get out my face, you old man." K.H. then saw X.J. pull out a gun and heard gunshots. K.H. testified that he could not remember whether Coley had stepped toward X.J. or had raised his arms. K.H. saw Coley lying on the ground and then ran to his friend's mother's car.

A.C., Coley's fifteen-year-old son, testified that he and his friends went to D.'s party. During the party, A.C. went into the back yard and saw X.J. and two other boys outside. A.C. then went back inside the house. A.C. testified that after going in the house, people were fighting and pushing and he saw someone hold up a gun. A.C. stated that he then called his

2

father because he was trying to avoid people with whom he did not want to associate and because he had seen someone hold up a gun. A.C. then went to the front yard with another friend. A.C. testified that after the rest of the people at the party had been kicked out of the house, he saw his father, Coley, arrive. A.C. stated that he saw his father talk to a boy named D.C. and tell him to "stay away from my kids." A.C. testified that Coley was not aggressive and was speaking in a normal conversational tone. A.C. stated that D.C. looked nervous. Then, A.C. saw X.J. come out into the street and stand behind Coley. A.C. testified that X.J. and Coley had not exchanged words when suddenly X.J. shouted "I'm fixing to up this bitch." A.C. testified that after X.J. shouted, Coley looked around and was facing X.J. when X.J. pulled a gun from his pants and shot Coley. A.C. stated that his father had his hands in the pocket of his sweatshirt and did not raise his hands or take any steps toward X.J. After the shots, A.C. saw Coley fall to the ground.

Z.C., Coley's nephew, testified that he attended the party with K.H. and A.C. After the party ended, Z.C. was in the front yard waiting for a ride home. Z.C. saw Coley walk toward the house. Z.C. described Coley's demeanor as calm. Z.C. was standing near his friends' mother's car when he heard shots fired. Z.C. turned and saw Coley fall to the ground.

Coley testified that on October 20, 2018, he was at home watching a basketball game when his son, A.C., called and told him that he was at a party and some kids he was not supposed to be around were waving guns. Coley then left his house to go to the party. Coley testified that his purpose in going to the party was to get his son and nephew and their friends away from a party where people had guns. Coley testified that when he arrived at the party, he saw kids scattered around the yard outside the house and in the street. Coley parked his car and started walking up the street toward the house. After getting out of the car, Coley encountered a 17-year-old boy, D.C. Because D.C. appeared to be afraid, Coley told him "I'm not here for

3

you for that, so, you know, get out of my face." Another boy, L., was standing near D.C. Coley stated that L. appeared to be afraid and walked off when he saw Coley. Coley told him to "stay away from my kids." After speaking to D.C. and L., Coley continued walking toward the house. Coley testified that he had his hands in his sweatshirt pocket and that he made no gestures toward D.C. or anyone else. Coley took five or ten steps and then heard someone behind him say, "I'm going to set this mother fucker off." Coley stated that he then turned around and saw gunfire and was shot three times.

Sergeant John Yurcina with the Pflugerville Police Department investigated the incident. Yurcina obtained a warrant for X.J. on October 21, 2018, and, after seeing X.J. leave his residence in a vehicle that afternoon, initiated a traffic stop and detained X.J. Yurcina obtained a search warrant for X.J.'s cellphone, and data on the phone revealed internet searches for guns and bullets made on the day of the incident as well as multiple searches for taxis on the night of the incident and searches for "shooting last night in Pflugerville, Texas" and for "Marco Coley."

The only witness called by counsel for X.J. at the adjudication hearing was Sergeant Yurcina. During his direct examination of Yurcina, counsel for X.J. offered into evidence a document titled "Mugshot Profile" as follows:

Q:    Now, Sergeant Yurcina, Respondent's Exhibit 12, that's actually a
      booking photo for [X.J.]?

A:    I wasn't there when it was taken, but it's consistent with a booking photo.

Q:    All right. Now when we say it's a booking photo, it's actually entitled
      "mugshot profile"; is that correct?

A:    Correct.

Q:    And this was actually done on October the 20th?

4

STATE: Your Honor, the State would object to him getting the information contained that was in this document into evidence without actually entering the document.

THE COURT: Sustained.

Q: Now, you've had an opportunity to review Respondent's Exhibit 12?

A: Yes.

Q: Now, do you recognize that as the mugshot profile for [X.J.]?

A: I do.

Q: And have you had an opportunity to look at it for—there is two sides?

A: Yes.

Q: Front and back? And that is the mugshot photo that was done for [X.J.] when he was taken into custody?

A: I believe this was taken when he was booked in by Officer Grotto here at Gardner-Betts.

Q: And that would have been on October 21st, 2018?

A: Yes, October 21st, 2018.

COUNSEL FOR X.J.:
At this time, Your Honor, we would offer Respondent's Exhibit 12 into evidence.

STATE: Your Honor, the State would still object. We don't believe that the document has been properly authenticated. It's not a certified copy and—

THE COURT: Sustained.

Counsel for X.J. later made an offer of proof and questioned Yurcina about the mugshot profile as follows:

Q: Now, according to Respondent's Exhibit 12, the mugshot photo, it indicates that [X.J.] was actually five feet; is that right?

5

A: Correct.

Q: All right. And 98 pounds?

A: Correct.

After hearing the evidence and listening to argument from both sides, the juvenile court announced its finding that the State had proven beyond a reasonable doubt that X.J. had assaulted Coley by shooting him. The juvenile court then adjudicated X.J. delinquent. The court filed findings of fact and conclusions of law in which it found that the testimony of all of the State's witnesses was credible, that Coley did not have a weapon at the time of the shooting, and that Coley did not assault or provoke X.J.

Before the disposition hearing, counsel for X.J. filed a document titled "Respondent's Social History and Proposed Dispositional Plan." The four-page document summarizes information contained in other parts of the court's file, including X.J.'s Adjudication and Referral History, his Education History while in detention, and his most recent psychological assessment and recommendations. The report recites details about X.J.'s personal history, family life, and his goals for the future. The report concludes with a brief discussion of X.J.'s treatment needs and recommends that X.J. be placed on probation at the Intermediate Sanctions Center (ISC). The document bears the electronic signature of Terrence T. Allen, MSSA, PhD, and was also signed by X.J.'s trial counsel. The State filed a written objection to the document at the commencement of the disposition hearing. The State objected to the document on the grounds that it was untimely filed; that it was prepared by X.J.'s attorney rather than by a probation officer, professional court employee, or professional consultant; and that the appropriate format

6

to present the evidence in the document was through testimony at the disposition hearing subject to cross-examination.

At the disposition hearing, the court heard testimony from several witnesses. Daryl Reed, the Juvenile Court Officer supervising X.J., testified that he had been working with X.J. since March 2018 when X.J. was referred on a criminal mischief charge. Reed stated that at the time of the disposition hearing, X.J. had five pending referrals, two of which were for felony assault of a public servant that occurred while X.J. was detained at Gardner-Betts. Reed testified that X.J. had been in safety-based seclusion at Gardner-Betts because he assaulted staff and peers. Reed conducted a Positive Achievement Change Tool assessment, which indicated that X.J. had a high risk to re-offend. Reed testified that X.J. had participated in the Southwest Key program and that he was unsuccessful in that program. Reed recommended that X.J. be placed at the ISC Level 5 for approximately one year to participate in aggression replacement therapy, social skills training, anger management, and moral reasoning therapy. Reed stated that he did not recommend placement at TJJD because X.J. had never participated in any community programs, has been on probation, and that placement at ISC would give him a chance to participate in programs locally and permit his family to participate in his treatment.

Kim Buck, a TJJD employee who works with juveniles sent to the department on determinate sentences, testified that if X.J. was ordered to go to TJJD on a determinate sentence he would be required to stay there for at least two years less the number of days he had already been detained. Buck testified about TJJD intake procedures, available programs, and release procedures.

Shawn Wilson, a psychologist with the Travis County Juvenile Probation Department, testified that he supervised a psychological assessment of X.J. in May 2019.

7

Wilson testified that his diagnostic impressions of X.J. were attention deficit hyperactivity disorder, intermittent explosive disorder, conduct disorder, trauma and stressor related disorder, cannabis disorder, and anxiolytic use disorder. Wilson testified about X.J.'s past threats of violence and about X.J.'s special education needs. Wilson assessed X.J.'s IQ as in the low average to borderline range. Wilson recommended that X.J. be placed in a secure setting such as ISC. Wilson testified that X.J.'s history of offenses and his behavior in detention indicated that he needed to be in a stable and secure setting where he could receive therapy and address his trauma exposure. Wilson also recommended that X.J. receive family therapy.

Daniel Lovelace, who had worked as a juvenile detention officer at Gardner-Betts, testified about an incident in March 2019 when X.J. had blocked the window to his room. Lovelace and others intervened and began removing items from X.J.'s room that he could use to block the window. Lovelace testified that X.J. became upset that they were removing items from his room and started coming toward Lovelace. Lovelace put his arm out and told X.J. not to come any closer. When X.J. continued to grab Lovelace and the others, a supervisor instructed them to restrain X.J. Lovelace testified that while they were attempting to restrain X.J., he bit Lovelace's arm. Matthew Black, who also served as a juvenile detention officer, testified that in April 2019, he intervened when another juvenile began to assault X.J. Black testified that while he was attempting to separate the two juveniles, X.J. attempted to bypass Black to get to the juvenile who had assaulted him. Black restrained X.J. and the two ended up sitting on the ground. Black stated that he asked X.J. if he wanted to get up and go to his room. X.J. said he did, and Black released him as they walked to X.J.'s room. When they got to the room, X.J. began trying to return to the other juvenile and resisted Black's attempt to close the door. Black

testified that X.J. then hit him in the face with a closed fist, after which X.J. calmed down and Black was able to close the door.

Jasmine Jenkins, a psychology intern at the Travis County Juvenile Probation Department, testified that she handled X.J.'s psychological evaluation under Wilson's supervision. Jenkins agreed with Wilson's recommendation of X.J.'s placement in a secure facility and therapy and services. Jenkins described X.J. as displaying symptoms of ADHD such as interrupting others in group settings. Jenkins testified that X.J. was cooperative and polite to her and that she has never seen him be disrespectful.

Terrence Allen, a research scientist at the Texas Juvenile Crime Prevention Center at Prairie View A&M University, testified that he was familiar with ISC programs such as the Southwest Key Program and with TJJD. Allen testified that he met X.J. once and met X.J.'s family once. Allen stated that he had read all the documents related to the case and that based on what he has read and observed he recommended that X.J. participate in a program that targets family functioning, education, and behavior. Allen testified that he believed X.J.'s actions in shooting Coley were the combined responsibility of X.J., X.J.'s family, and the school system. Allen testified that based on what he had read, X.J. has not been held accountable for things he did that led up to the shooting such as substance abuse and other impulsive behavior and, consequently, X.J. was not able to know the difference between right and wrong. Allen stated that family therapy would help X.J. learn to be accountable. For this reason, Allen recommended that X.J. be placed in a program near his family so they could consistently interact with him and participate in family therapy. Allen stated that, from what he had read, it appeared that X.J. did not value academic achievement and that it would be helpful for him to understand that education is the quickest, easiest, and most sensible path to social mobility. For this reason,

Allen recommended a program that put academic achievement in context for X.J. Allen also testified that academic achievement would ameliorate X.J.'s ADHD symptoms and allow him to choose different people with whom to socialize. Allen stated that he believed X.J. would be successful in a program that addressed his family functioning, educational needs, and mental health issues because X.J. has been honest about his behavior, which suggests to Allen that X.J. has "exercised some degree of humility." Allen recommended placement in an ISC program where his family could participate on a regular basis. Allen testified that TJJD did not have the specialized training to provide X.J. with the recommended programs.

At the end of Allen's direct testimony, counsel for X.J. offered the four-page document titled "Respondent's Social History and Proposed Dispositional Plan" to which the State had previously objected. Allen described the document as a disposition plan for X.J. that included information that Allen and X.J.'s counsel learned during the course of Allen's working with X.J. The State renewed its objection, which the trial court sustained. X.J.'s counsel tendered the exhibit to the court in an offer of proof.

On cross-examination, Allen stated that he met with X.J. once for ninety minutes and separately met with X.J.'s parents for about an hour. Allen stated that X.J. did not tell him that he was involved in any gang activity, but that X.J. did tell him that he had access to numerous firearms. X.J. did not disclose how he had access to firearms other than to say that his friends had "a bunch of guns." X.J. told Allen about a previous shooting incident that had occurred at Coley's house. Allen testified that he was aware of social media postings of photos and videos over the past two years depicting X.J. displaying firearms but stated that he had not seen the photos or videos. Allen testified that X.J. reported that he used drugs and alcohol, but Allen did not remember if X.J. told him how he obtained drugs or alcohol. Allen agreed that he

10

would be "interested in knowing" the extent to which there was drug use in X.J.'s home in order to assess whether it would be in X.J.'s interest to participate in family therapy.

Allen stated he prepared to testify primarily by reviewing X.J.'s most recent psychological report and a May 2018 mental health assessment. Allen clarified that the four-page report counsel for X.J. offered into evidence was jointly prepared by Allen and X.J.'s counsel and that he then reviewed it. Allen testified that he looked at school and detention reports, but that he had not reviewed any offense reports or reports of incidents that had occurred while X.J. was in detention.

Daniel Hoard, the deputy chief over clinical services for the Travis County Juvenile Probation Department, testified that he had reviewed X.J.'s psychological evaluation and its recommendations but had not evaluated X.J. personally or looked at his other records. Hoard testified generally about the programs available in an ISC program, the program's goals, and the program's ability to address X.J.'s needs.

At the conclusion of the evidence, the juvenile court imposed a ten-year determinate sentence to begin at TJJD, with a possible transfer to the Texas Department of Criminal Justice-Institutional Division. This appeal followed.

## STANDARD OF REVIEW

X.J.'s two appellate issues challenge the juvenile court's rulings on the admission of evidence. We review the court's evidentiary rulings under an abuse of discretion standard. *In re B.P.S.*, No. 03-07-00284-CV, 2008 WL 3166310, at *3 (Tex. App.—Austin Aug. 6, 2008, no pet.) (mem. op.). The court abuses its discretion only when the decision lies "outside the zone of reasonable disagreement." *Id.* In his first issue, X.J. contends that the juvenile court should

11

have admitted the mugshot profile. In his second issue, X.J. asserts that the trial court should have admitted the document titled "Respondent's Social History and Proposed Dispositional Plan."

The court sustained the State's objection that the mugshot profile X.J. sought to admit into evidence was not properly authenticated. *See* Tex. R. Evid. 901 (to satisfy requirement of authenticating or identifying item of evidence, proponent must produce evidence sufficient to support finding that item is what proponent claims it is). On appeal, X.J. asserts that there is no requirement that a booking sheet or mugshot profile "has to be a certified copy before it is admitted into evidence." A certified copy of a mugshot profile would be self-authenticating and would require no extrinsic evidence of authenticity to be admitted. *Id.* R. 902. X.J. correctly states that a mugshot profile or booking sheet need not be a certified copy to be admissible. If it is not a certified copy, however, it must be authenticated by some other means. *See id.* R. 901. Only relevant evidence is admissible, *id.* R. 402, and evidence not properly authenticated is irrelevant, *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012) (evidence not properly authenticated is irrelevant, and authentication is "condition precedent" to admissibility). X.J.'s brief fails to identify how the mugshot profile was properly authenticated. Instead, X.J. argues that, because a mugshot profile does not have to be a certified copy to be admissible, "the State's objection did not have merit and the trial court should not have sustained it."

X.J. asserts that the two-page mugshot profile was relevant because information contained in the profile establishes X.J.'s height and weight on the day after the shooting. Counsel for X.J. argued that this evidence was relevant to X.J.'s self-defense theory because it showed that X.J. was small relative to Coley. X.J. offered the mugshot profile through Sergeant Yurcina who stated that the photograph of X.J. in the mugshot profile was "consistent with a booking photo." Yurcina testified that he was not present when the picture in the mugshot

12

profile was taken or when another officer at the juvenile detention center recorded X.J.'s personal information, including his height and weight. Because Yurcina did not create the mugshot profile, even if he could identify the photo as one of X.J., who was present in the court room, his testimony alone could not establish that the mugshot profile offered into evidence was the document created by the officer that booked X.J. into the juvenile detention center on October 21, 2018. *See Demison v. State*, No. 11-15-00126-CR, 2017 WL 3573254, at *8 (Tex. App.—Eastland Aug. 17, 2017, no pet.) (mem. op., not designated for publication) (trial court abused its discretion by admitting into evidence booking photo with information stating defendant's height and weight that was offered through witness who did not create it). The trial court did not abuse its discretion in determining that X.J. failed to sufficiently demonstrate the offered document's authenticity.

Even if the court had abused its discretion in refusing to admit the mugshot profile, any such error was harmless. When a juvenile adjudicated delinquent receives a determinate sentence, we apply the criminal-harm analysis set forth in Texas Rule of Appellate Procedure 44.2. *See In re J.H.*, 150 S.W.3d 477, 485 (Tex. App.—Austin 2004, pet. denied). The erroneous exclusion of evidence is non-constitutional error and any harm is assessed under rule 44.2(b). *See Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010). We must disregard non-constitutional error unless it "affect[s] substantial rights." *See* Tex. R. App. P. 44.2(b). A substantial right is affected when the error had a "substantial and injurious effect or influence in determining the [factfinder's] verdict." *Coble*, 330 S.W.3d at 280. In making this determination, we review the record as a whole, including any testimony or physical evidence admitted for the factfinder's consideration, the nature of the evidence supporting the verdict, and

the character of the alleged error and how it might be considered in connection with other evidence in the case. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002).

We have reviewed the record as a whole and conclude that the exclusion of the mugshot profile did not have a substantial effect or influence on the juvenile court adjudication. Evidence presented at trial showed that Coley did nothing to threaten or intimidate X.J. prior to the shooting and that Coley had his hands in his pockets and was not facing X.J. until he turned when X.J. shouted and fired his gun. Coley testified that he was unarmed and facing away from X.J. when he heard X.J. shout, turned, and was immediately shot. Although one witness testified that X.J. and Coley were facing each other, that witness also testified that she heard no yelling and did not see Coley make any movement toward X.J. before she saw him back up and fire his gun at Coley. Another witness testified that Coley's demeanor seemed "angry" but that he did not gesture or move toward X.J. There was also testimony that Coley was a big man and that he was bigger than X.J.

An actor is justified in using deadly force if, among other things, the actor reasonably believes deadly force is immediately necessary to protect the actor against another's use or attempted use of unlawful deadly force. *See Morales v. State*, 357 S.W.3d 1, 4 (Tex. Crim. App. 2011) (citing Tex. Penal Code § 9.32(a)(2)(A)). The juvenile court implicitly rejected X.J.'s self-defense theory when it adjudicated him delinquent. *See Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991) (jury's verdict of guilty is implicit finding rejecting defendant's self-defense theory). A rational trier of fact could have found that X.J. did not reasonably believe that shooting Coley was immediately necessary to protect him from any use or attempted use of deadly force. *See Granger v. State*, 3 S.W.3d 36, 39 (Tex. Crim. App. 1999) (noting that reasonableness of defendant's belief that deadly force was necessary is ordinarily question of

14

fact). In light of the evidence in the record demonstrating that X.J. was a 15-year-old boy and that Coley was a big man, we conclude that any abuse of discretion in the exclusion of evidence of X.J.'s exact height and weight did not have a substantial and injurious effect or influence on the juvenile court's rejection of X.J.'s self-defense theory. The record also reflects that X.J. had appeared before the juvenile court on several occasions before and during trial, which provided the court an opportunity to observe his size relative to Coley's. No harm resulted from the court's refusal to admit the mugshot profile. We overrule X.J.'s first issue.

In his second issue, X.J. asserts that the trial court erred in sustaining the State's objection to the document titled "Respondent's Social History and Proposed Dispositional Plan." X.J. maintains that the document is admissible as a "written report of a professional consultant" under Texas Family Code section 54.04(b). *See* Tex. Fam. Code § 54.04(b) (at disposition hearing court may consider written reports from probation officers, professional court employees, or professional consultants in addition to testimony of witnesses). Section 54.04(b) is discretionary; it permits the court to consider written reports but does not require it to do so. Furthermore, the purported author of the written report, Dr. Allen, testified extensively at trial about his recommendation that X.J. be placed in a secure program such as ISC rather than at TJJD. X.J. does not identify anything in the report that was not covered by Dr. Allen's testimony. We conclude that the juvenile court did not abuse its discretion in refusing to admit the proffered report into evidence and that, even if it could be considered an abuse of discretion, it was not harmful because the report would not have had a substantial effect or influence on the court's disposition determination. We overrule X.J.'s second issue.

15

## CONCLUSION

Having overruled X.J.'s two issues, we affirm the order of the juvenile court.

_____

Thomas J. Baker, Justice

Before Chief Justice Rose, Justices Baker and Triana

Affirmed

Filed:   December 3, 2020

16